# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. WESLEY JONES

**Appeal from the Criminal Court for Shelby County**
**No. 10-06236     James C. Beasley, Jr., Judge**

**No. W2012-00301-CCA-R3-CD  - Filed February 27, 2013**

The Defendant-Appellant, Wesley Jones, appeals his conviction for first degree premeditated murder.  On appeal, he argues that (1) the trial court abused its discretion in allowing a witness to be recalled to testify, and (2) the evidence is insufficient to support his conviction. Upon review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Mark Mesler, Memphis, Tennessee, for the Defendant-Appellant, Wesley Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Fleming and Reginald Henderson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial.**  Stephanie Kimball testified that she was the daughter of the victim, Glenda Kimball.  She said that on Saturday, March 13, 2010, Sergeant Lundy informed her that her mother's body had been found.  Kimball said that the last time she had seen or spoken to her mother was "like a day or so before that[.]"

On cross-examination, Kimball stated that she also talked to Sergeant Lundy on Friday, March 12, 2010, because she and her son had been unable to locate her mother that day.  During the March 12, 2010 conversation, Sergeant Lundy told her that he could not give her any information about the body they had found near Lucille Price Park because they had not yet identified the body.  When asked if she told Sergeant Lundy that she had last seen

her mother at 7:00 a.m. on Friday, March 12, 2010, she responded, "No sir. I said it was the day before."

Erroll Davis testified that on the afternoon of March 12, 2010, he discovered the victim's body while picking up cans in a wooded area near Lucille Price Park in Memphis, Tennessee. He stated that he immediately notified the sanitation department of the body and then walked to a nearby fire station to show them the location of the victim's body. Davis said he remained at the crime scene before accompanying the police to the homicide division, where he told the police that he did not know how the victim's body got to the area near the park and did not know who put the body there. Davis admitted that he had a prior felony conviction for burglary of a motor vehicle and two misdemeanor convictions for theft.

On cross-examination, Davis said he signed a form consenting to give a saliva sample containing his DNA. He also said that the police did not ask him to remove his shirt for the purpose of examining his back during the interview.

Udell Shelton, an officer with the Memphis Police Department, testified that he responded to a call that a body had been found near Lucille Price Park on March 12, 2010. When he arrived at the scene at 7:15 p.m., he observed the victim's body and protected the crime scene until other officers arrived. Officer Shelton stated that there were no clothes on the victim's body and that there was no other evidence near the crime scene.

Autra Fitch testified that he had seen the victim, an acquaintance, around 7:15 to 7:30 p.m. on Thursday, March 11, 2010. Approximately ten minutes later, Fitch saw the victim and Jones, whom he had known for several years, leave a store at the corner of Smith Avenue and Bellevue Boulevard. When Fitch walked down Smith Avenue a short distance, he saw the victim and Jones again. Once he found a ride home, Fitch saw the victim and Jones on Capitol Street walking towards Lucille Price Park. A short time later, he saw them near a bench in the park. Fitch said that this was the last time he saw the victim. On March 13, 2010, Fitch gave a statement to police about his observations and identified a picture of the victim. He also identified Jones in a photo spread. Fitch admitted that he had a prior conviction for conspiracy to commit money laundering. On cross-examination, he said that the police never asked him to submit a DNA sample.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, testified that she performed the autopsy on the victim. She stated that the victim's body was unclothed and was in the early stages of decomposition when it arrived at her office. During the autopsy, Dr. Chancellor noticed that the inner lids of the victim's eyes and inner portion of her lips had pinpoint hemorrhages indicating that the victim had died from asphyxiation. The victim also had superficial abrasions and bruises on her neck that were indicative of manual

strangulation. After considering the pinpoint hemorrhages and the injuries to the victim's neck, Dr. Chancellor concluded that the victim's cause of death was manual strangulation. She explained how an individual dies from manual strangulation:

> [W]hen a person is manually strangled generally the assailant has his or her hands around the neck . . . and the blood vessels that supply oxygen to the brain are compressed. . . .
>
> The thing is usually there's some sort of struggle so that pressure is intermittent. If the pressure is held constant for about ten seconds the person will pass out. They will become unconscious and will not move, [and] if the pressure is released after that point before irreversible brain damage has occurred[,] they will wake up and all will be normal.
>
> So in order to manually strangle someone the compression has to be held for somewhere between two and three minutes in a constant way. During that time a person will already become unconscious but the two to three minutes lack of oxygen with compression around the neck causes irreversible brain injury and the person will not wake up or cannot be revived.

Dr. Chancellor took swabs from the vaginal, oral, and anal orifices and collected a scalp hair sample and a pubic hair sample, which were included in the sexual assault evidence kit. In addition, she took fingernail clippings from the victim's hands.

Dr. Chancellor opined that the time between the victim's death and the time that the body was discovered was approximately twenty-four hours. She also noted that the victim's body had some superficial abrasions on the back and buttocks and bruises to the left and right sides of the chest. In addition, she observed some areas of bleeding from warts inside the vaginal cavity and some irritation to the vaginal area, which was consistent with recent sexual intercourse. She noted that there was some material, later identified as skin cells, found underneath the victim's fingernails on her right hand. In addition, the victim's tongue was bruised because she had bitten it. She stated that the abrasions on the victim's neck were consistent with scratch marks from the perpetrator's fingernails.

Kevin Lundy, a sergeant with the Memphis Police Department, testified that he was the case coordinator for this case. He arrived at the crime scene between 7:15 and 7:45 p.m. on March 12, 2010, and was able to observe the victim's body before it was moved. Sergeant Lundy said that he and other officers searched the entire field near the body and were unable to locate any clothing items, footprints, or drag marks. After talking with Autra Fitch about seeing the victim and Jones together just prior to the victim's death, Sergeant Lundy

determined that he needed to talk to Jones because Jones "would have been the last person to be seen [with] the victim" prior to her death. He said that Fitch told him Jones was wearing a waist-length, dark jacket and dark pants or jeans at the time he saw Jones with the victim. He subsequently interviewed Jones and obtained samples of Jones's DNA.

Sergeant Lundy said that during the interview, Jones admitted that he spent some time with the victim on Thursday, March 11, 2010, the day before the victim's body was found. Jones said that he and the victim were at a store at the corner of Smith Avenue and Bellevue Boulevard and that he was smoking some marijuana. The victim asked him for a cigarette, and he told her he needed the cigarette to light his marijuana joint. Jones stated that when the owner of the store came outside and informed them that they could not be there, Jones and the victim left the store separately. Sergeant Lundy noted that during the interview, Jones was wearing a dark jacket and jeans, which was consistent with Fitch's description of Jones's clothing prior to the victim's murder. Sergeant Lundy also noticed a scratch on Jones's arm, which Jones claimed he had received during a "scuffle" at a club when someone tried to steal his money. When Sergeant Lundy asked Jones what other injuries he suffered during the "scuffle," Jones pulled his shirt up and showed him some other scratches on his back. Photographs of these scratches were entered into evidence. During the interview, Jones denied having any contact with victim and denied having sexual intercourse with her. Sergeant Lundy said that Fitch later identified Jones in a photo spread as the individual who was with the victim shortly before her death.

On cross-examination, Sergeant Lundy stated that he had several conversations with Stephanie Kimball, the victim's daughter, around the time that the victim's body was found He said that when he talked to Kimball the night of March 12, 2010, he did not know the identity of the body found in Lucille Price Park. Sergeant Lundy said he thought Kimball had told him that the last time she had seen her mother was at 7:00 a.m. on Friday, March 12, 2010.

Sergeant Lundy said that on Saturday, March 13, 2010, Lawrence Goodwin asked to talk to him because Goodwin had heard his name mentioned in conjunction with the victim's death. He talked to Goodwin before he interviewed Jones. Sergeant Lundy admitted that he did not take a statement from Goodwin and did not ask him for a sample of his DNA. He also admitted that he did not look at Davis's, Fitch's, or Jones's fingernails after learning that the victim had scratch marks on her neck. Sergeant Lundy acknowledged that he did not have Fitch remove his shirt to determine whether he had scratch marks on his body. He also acknowledged that he did not ask Jones to give him the jacket he was wearing during the interview, even though the jacket matched Fitch's description of the one Jones was wearing shortly before the victim's death. Sergeant Lundy admitted that Jones consented to giving him a DNA sample and called him the day after his interview to give him his new cell phone

-4-

number. He said he did not send Davis's DNA for testing because everything Davis had told the police was consistent with the proof they had uncovered during their investigation.

Donna Nelson, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified that she performed DNA testing on the samples taken from the victim's body. She determined that none of the evidence collected in the sexual assault evidence kit had the presence of semen. When she tested the fingernail scrapings from the victim, she obtained a partial DNA profile that showed the presence of male DNA on the victim. At that point, Agent Nelson recommended that Sergeant Lundy send the fingernail scrapings to Orchid Cellmark, a private lab with more sensitive instrumentation for DNA testing. Agent Nelson said that Jones's DNA was consistent with the DNA found underneath the fingernails of the victim's right hand.

Huma Nasir, a forensic DNA analyst at Orchid Cellmark, testified that she performed DNA analysis testing on the fingernail clippings from the victim. Ms. Nasir determined that the predominate DNA profile belonged to Jones and the minor DNA profile belonged to the victim. She also stated that the large amount of DNA found underneath the victim's fingernails on her right hand could have been there for only a short amount of time prior to its collection because it would have been removed when the victim washed her hands. She also stated that this DNA, which was in the form of skin cells, was consistent with the scratch marks on Jones's body.

Stephanie Kimball was recalled by the State for the limited purpose of clarifying when she last saw her mother prior to the discovery of her mother's body. Kimball testified that her mother's body was found on Friday, March 12, 2010. When asked when was the last time she had seen her mother, she responded: "It was that Wednesday or that Thursday. I'm sure it was that Thursday because I seen [sic] her on the side of the store. That Friday morning she didn't come home so me and my son started looking for her."

## ANALYSIS

**I. Recall of Witness.** Jones argues that the trial court abused its discretion in allowing the State to recall Stephanie Kimball, the victim's daughter, for the purpose of clarifying when she last saw her mother. He asserts that Tennessee Rule of Evidence 615 "should be used to prevent witnesses who have already testified from listening to other proof at trial and then being recalled to 'clarify' that testimony." He claims that the State violated "the spirit" of Rule 615 because Kimball's testimony on recall that she last saw her mother on Thursday, March 11, 2010, negated Sergeant Lundy's testimony that Kimball told him that she had last seen her mother at 7:00 a.m. on Friday, March 12, 2010. He claims that Sergeant Lundy's testimony on this point was particularly significant because it meant that

he was not the last person to see the victim alive. Jones further argues that the trial court, by allowing the State to recall Kimball, "infringed on the province of the jury by deciding for them which witness was to be believed on this crucial point [of] testimony."

The State responds that Jones has waived this issue because he failed to include a transcript from the motion for new trial hearing in the appellate record. In addition, the State asserts that the trial court did not abuse its discretion in allowing it to recall Kimball. Finally, the State contends that even if the trial court abused its discretion in allowing Kimball to be recalled, this error is harmless in light of the overwhelming evidence of Jones's guilt. We conclude that the trial court did not abuse its discretion in allowing the State to recall Kimball.

Kimball initially testified at trial that she spoke to Sergeant Lundy on Saturday, March 13, 2010, and that the last time she had seen or spoken to her mother was "like a day or so before that[.]" On cross-examination, when asked if she told Sergeant Lundy that she had last seen her mother at 7:00 a.m. on Friday, March 12, 2010, she responded, "No sir. I said it was the day before." Sergeant Lundy testified that he thought Kimball had told him that the last time she had seen her mother was at 7:00 a.m. on Friday, March 12, 2010.

The trial transcript shows that the rule of sequestration was requested and that the witnesses were placed under the rule and excluded from the courtroom. Stephanie Kimball testified as the State's first witness and was excused. The record indicates that Kimball remained in the courtroom following her testimony and stayed for the duration of the trial. The State, at the close of its case-in-chief, requested that it be allowed to recall Kimball to clarify the day when she last saw her mother. The State asserted that it needed to clarify this fact because Sergeant Lundy had testified that he thought Kimball had told him the last time she saw her mother was at 7:00 a.m. on Friday, March 12, 2010, and because Kimball had informed the State that this was not what she told Sergeant Lundy. The State asserted that if Kimball were allowed to be recalled, she would testify that she last saw her mother on Wednesday or Thursday morning and that she and her son were actively looking for her mother on Friday morning.

The defense objected, arguing that the State had already had an opportunity to clarify Kimball's testimony on this point. The court noted that Kimball had already testified that she told Sergeant Lundy she had last seen her mother the day before March 12, 2010. Then the defense argued that recalling Kimball would be improper because Kimball had been listening to the testimony of all of the other witnesses at trial. The State responded that it should be allowed to recall Kimball because she was not changing her testimony. The court stated that although it would not normally allow the State to recall a witness, it would permit the State to recall Kimball for the limited purpose of clarifying when she last saw her mother prior to

the discovery of her mother's body. Before allowing the State to recall Kimball, the trial court gave the following instruction to the jury: "Alright, ladies and gentlemen, I have agreed to allow Ms. Stephanie Kimball to resume the stand for the limited purpose of clarifying a particular issue, so she's going to be recalled at this point."

On recall, Kimball testified that her mother's body was found on Friday, March 12, 2010. When asked about the last time she had seen her mother, she responded: "It was that Wednesday or that Thursday. I'm sure it was that Thursday because I seen her on the side of the store. That Friday morning she didn't come home so me and my son started looking for her." The defense declined to cross-examine Kimball after she was recalled to testify.

Tennessee Rule of Evidence 615 provides the current rule regarding sequestration of witnesses:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

The purpose of Rule 615 is to ensure that a witness's testimony is not improperly influenced by the other proof presented at trial. However, the Advisory Commission Comment to Rule 615 states: "If a witness inadvertently and unintentionally hears some trial testimony, the sense of the rule would permit the judge to allow the witness to testify if fair under the circumstances." Tenn. R. Evid. 615, Advisory Comm'n Comment.

A trial court has "wide discretion in determining whether to impose the sanction of excluding the evidence of the witness suspected of having violated the rule." State v. Richard Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992) (citing State v. Moffett, 729 S.W.2d 679, 681 (Tenn. Crim. App. 1986)); see State v. Wicks, 729 S.W.2d 283, 286 (Tenn. Crim. App. 1987) ("The trial judge has broad discretion in the decision regarding the

exclusion of witnesses in accordance with the rule, and unless this discretion is abused his action will not be reversed.").

The State argues that this issue is waived because Jones failed to include in the appellate record the transcript from the motion for new trial hearing. Although such an omission may, in some cases, result in a waiver of an issue on appeal, we conclude that the record before us is sufficient to review Jones's claim. We also conclude that Jones was not prejudiced by the State's recall of Stephanie Kimball because her testimony on recall was substantially the same as her initial testimony. As we will explain in the next section, the evidence against Jones was overwhelming. Jones's DNA, in the form of skin cells, was found underneath the fingernails of the victim's right hand, Jones had scratches on his body, Fitch saw Jones with the victim the night of March 11, 2010, and the victim's body was found approximately twenty-four hours later in the same area. We conclude that Jones has failed to demonstrate that a violation of the rule of sequestration occurred or that the trial court abused its discretion in allowing the State to recall Kimball.

**II. Sufficiency of the Evidence.** Jones also argues that the evidence is insufficient to sustain his conviction for first degree premeditated murder. He contends that there was no proof of premeditation because the evidence suggested that the victim's death resulted from a physical altercation rather than a premeditated attack. He asserts that there was no evidence that he had sexual intercourse with the victim. He also asserts that his DNA under the victim's fingernails and the scratches on the right side of his back were more consistent with a physical altercation than an attack. Finally, he contends that the jury failed to consider the issue of premeditation before rendering its verdict after thirty-three minutes.

The State responds that Jones has waived this issue for failing to make appropriate references to the record and that the evidence is sufficient to support Jones's conviction. We agree that the evidence is sufficient to sustain the conviction for first degree premeditated murder.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is

direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The State may prove the perpetrator's identity using only circumstantial evidence. Rice, 184 S.W.3d at 662 (citing State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2006). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

The State first argues that Jones has waived this issue for failing to make appropriate references to the record. "Issues which are not supported by argument, citation to authorities,

or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). In addition, Tennessee Rule of Appellate Procedure 27 provides that an appellant's brief must contain, among other requirements, a statement of the issues presented for review; a statement of the case, including the nature of the case, the course of proceedings, and the lower court's disposition; a statement of facts, specifying the facts relevant to the issues presented for review along with appropriate references to the record; a statement of the applicable standard of review; and arguments containing citations to authorities and references to the record. Tenn. R. App. P. 27(a). Although we agree that Jones failed to make appropriate references to the record in the argument section of his brief regarding this issue, we will nevertheless address his issue on appeal.

Viewed in the light most favorable to the State, we conclude that the evidence was sufficient to sustain Jones's conviction for first degree premeditated murder. Significantly, Jones admitted to police that he was with the victim the day before her body was found. The evidence showed that Jones was the last person seen with the victim prior to her death. In addition, Fitch testified that the evening of March 11, 2010, he saw Jones and the victim leave a store and walk into Lucille Price Park. Davis said he found the victim's body in a remote area near this park approximately twenty-four hours later. Officer Shelton stated that there were no clothes on the victim's body and that there was no other evidence at the crime scene. Dr. Chancellor testified that the victim's cause of death was manual strangulation and that the evidence from the autopsy revealed that the victim had engaged in sexual intercourse shortly before her death. She also observed a material, later identified as skin cells, underneath the fingernails of the victim's right hand. Sergeant Lundy testified that during his interview with Jones, he observed scratches on Jones's arm and back. In addition, he stated that at the time of the interview, Jones was wearing clothes consistent with Fitch's description of Jones's clothing prior to the victim's murder. Special Agent Nelson testified that Jones's DNA was consistent with the DNA found underneath the fingernails of the victim's right hand and that she recommended that Sergeant Lundy send the fingernail scrapings to Orchid Cellmark, a private lab for further DNA testing. Huma Nasir, a forensic DNA analyst at Orchid Cellmark, testified that the skin cells containing DNA that were found underneath the fingernails of the victim's right hand matched Jones's DNA and were consistent with the scratch marks on Jones's body. Although Jones told the police that he had no physical contact with the victim, that he did not have sexual intercourse with the victim, and that the scratches on his body were from a fight in a club, the jury was free to discredit this evidence. Given this proof, a reasonable jury could have found premeditation beyond a reasonable doubt based on the nature and cruelty of the killing, which consisted of the victim being manually strangled as she clawed to get a breath. We conclude that the evidence was sufficient to support Jones's conviction.

## CONCLUSION

Upon review, we affirm the trial court's judgment.

_____

CAMILLE R. McMULLEN, JUDGE